

**ORDERED in the Southern District of Florida on June 10, 2014.**

Laurel M. Isicoff, Judge
United States Bankruptcy Court

**Tagged Opinion**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re:                                                    Case No. 10-27532-BKC-LMI

FIRST FOLIAGE, L.C.,                                      Chapter 11

       Debtor.
_____/
FIRST FOLIAGE, L.C.,                                      **Adv. Case No.: 10-03591-LMI**

       Plaintiff,
v.

RURAL COMMUNITY INSURANCE
SERVICES, a  foreign corporation,
FIREMAN'S FUND INSURANCE
COMPANY, and INSURANCE FOR
AGRICULTURE, LLC,

       Defendants.
_____/

**ORDER GRANTING IN PART AND DENYING IN PART CROSS MOTIONS
FOR PARTIAL SUMMARY JUDGMENT**

This matter came before me for hearing on October 2, 2013 on the Motion for Partial Summary Judgment on RCIS's Affirmative Defenses and Incorporated Memorandum of Law ("Motion for Partial Summary Judgment") (ECF #262) filed by the Plaintiff, Jacqueline Calderin ("Plaintiff" or "Trustee"), and the Motion for Summary Judgment on the Remaining Claims in the Trustee's Second Amended Complaint and Incorporated Memorandum of Law (ECF #278) (the "Motion for Summary Judgment") filed by the Defendant, Rural Community Insurance Services ("RCIS").

The Trustee seeks partial summary judgment on the following affirmative defenses asserted by RCIS: 1) unclean hands; 2) estoppel; 3) the economic loss doctrine; 4) setoff; and 5) recoupment.  RCIS seeks summary judgment as to all remaining counts of the Second Amended Complaint, as well as summary judgment on its affirmative defense of recoupment.

### FACTS[1]

First Foliage, L.C. was a leading national supplier and marketer of indoor and outdoor tropical plants sold primarily to large retailers.  When it operated, First Foliage received Multi-Peril Crop Insurance ("MPCI")[2] issued by the Fireman's Fund Insurance Company ("Fireman's Fund") and through RCIS pursuant to the provisions of 7 U.S.C. §1501 *et seq.*—the Federal Crop Insurance Act (the "FCIA").  The FCIA authorizes an Approved Insurance Provider ("AIP") to issue MPCI policies through Managing General Agents ("MGA").  RCIS is an MGA and Fireman's Fund is an AIP.  MPCI policies are in turn reinsured by the Federal Crop

---

[1] These facts are taken from the summary judgment pleadings; any disputed facts will be identified as such.

[2] MPCI coverage is offered by a government insurer and premiums are usually government subsidized.  The program is authorized by the Federal Crop Insurance Act; since 1996, the Risk Management Agency administers the MPCI and calculates the premiums based on individual risk factors.

Insurance Corporation (the "FCIC") through a Standard Reinsurance Agreement ("SRA") between the FCIC and an AIP. The Risk Management Agency ("RMA"), an arm of the United States Department of Agriculture, oversees this whole structure and audits the AIPs.

First Foliage completed and signed two applications for MPIC policies written by Fireman's Fund from RCIS: one in 2000 for the crop years 2001 through 2005 and another in 2005 for crop year 2006 (collectively, the "Crop Insurance Applications").[3] On the first page of each of the applications, First Foliage was required to identify all persons holding a "substantial beneficial interest" ("SBI").[4] First Foliage omitted, from both Crop Insurance Applications, the names and other required information of Calixto Garcia-Velez and Sixto Campano, two shareholders that held an SBI in First Foliage. The two omitted shareholders held a combined 34% interest in First Foliage. There has been no suggestion that omission of Garcia-Velez or Campano was deliberate.

In 2005, Hurricanes Dennis and Katrina struck South Florida causing damages to First Foliage's crops. As a result, on September 26, 2005, RCIS paid First Foliage an indemnity of $7,617,591 (the "2005 Payment"). In 2005, Hurricane Wilma caused First Foliage to suffer losses again and on May 31, 2006, RCIS paid First Foliage an indemnity of $2,381,171 (the "2006 Payment"). The crop insurance policy that was in effect when the loss occurred in 2005 was Common Crop Insurance Policy 04-BR (the "2005 Policy"). The crop insurance policy that was in effect when the loss occurred in 2006 was Common Crop Insurance Policy 05-BR (the

---

[3] "Crop year" refers to the time period from one year's harvest to the next; the crop year varies for each commodity. The definition of "crop year" is available at http://www.investopedia.com/terms/c/cropyear.asp.
[4] An SBI is defined in the FCIC's handbook as an interest held by any person of at least 10 percent in the applicant or insured.

"2006 Policy") (collectively, the "Crop Policies").[5]  The funds RCIS paid to First Foliage with respect to each loss originated from the FCIC.

In 2009, the RMA audited RCIS's records and discovered First Foliage's omission of the two SBI holders.  The RMA then required RCIS to return $2,601,364 to the FCIC as provided by the FCIC 18010, 2005 Crop Insurance Handbook[6] which amount represents approximately 34% (the total of the undisclosed SBI) of the insurance proceeds collectively paid to First Foliage by RCIS for the two hurricane losses.

On December 3, 2009, RCIS sent a letter (the "December 3 Letter") [7] to First Foliage advising First Foliage that, because First Foliage omitted the two SBI holders, RCIS was demanding repayment of 34% of the 2005 Payment—$2,595,574 (the "2005 Overpayment Demand") and repayment of 34% of the 2006 Payment—$800,869 (the "2006 Overpayment Demand") (The 2001 Overpayment Demand and the 2005 Overpayment Demand will be referred to collectively as the "Overpaid Indemnity").[8]

The December 3rd Letter advised First Foliage that if it did not agree with the overpayment demands, First Foliage could appeal by writing a letter to RCIS's compliance department, or requesting an arbitration hearing through the American Arbitration Association, each as provided by 7 C.F.R. §457.8(14)(f)(2).

---

[5] Form 04-BR, promulgated by the FCIC, contains the basic provisions of the MPCI policy in effect for the 2005 Crop Year, which lasted from October 1, 2004 through September 30, 2005; Form 05-BR, also promulgated by the FCIC, contains the basic provisions of the MPCI policy in effect for the 2006 Crop Year, which lasted from October 1, 2005 through May 31, 2006.  *See* Policies, ECF #278-1, Ex. 1.

[6] *See* ECF #278-10, Ex. 2 of Ex. 9 (p. 13 of 77, *et seq*).

[7] *See* ECF #278-9, Ex. 8.

[8] Section 2.(b)(2) of the 2004 Policy provides that if the social security number or EIN of a person with an SBI in the insured crop is not disclosed and the undisclosed person is not otherwise ineligible for insurance coverage under the FCIA, then "the amount of coverage available under the policy will be reduced proportionately by the person's share of the crop."  Section 2.(b)(2) of the 2005 Policy is much more detailed, and makes clear that such ineligibility will require the insured to "repay the amount of the indemnity" equal to the percentage interest of the undisclosed SBI. Garcia-Velez and Campano were eligible for insurance coverage.

On December 31, 2009, First Foliage sent a letter (the "December 31 Letter") to RCIS, which First Foliage identified as its "Notice of Appeal" of determinations expressed in the December 3 Letter.  First Foliage cited several reasons why the determinations were inappropriate and suggested mediation in lieu of the other alternatives offered in the December 3 Letter.[9]

On January 25, 2010, RCIS sent a second letter (the "January 25 Letter")[10] to First Foliage demanding either payment in full from First Foliage or a payment arrangement if First Foliage was unable to immediately pay the Overpaid Indemnity in full.  The January 25 Letter also offered First Foliage the opportunity to dispute the balance owed.  Finally, the letter advised First Foliage that if it did not pay the Overpaid Indemnity in full or otherwise make payment arrangements within 30 days, RCIS was required to submit First Foliage's name and tax identification number to the RMA for inclusion to the Ineligible Tracking System ("ITS").  The ITS is a database of records of producers who are not eligible to participate in any crop insurance program insured or reinsured by the FCIC.[11]  When a producer applies for crop insurance, the insurance company automatically checks the ITS for the producer's eligibility; if the producer is ineligible, the producer will be notified and crop insurance coverage will not attach.[12]  A producer is usually placed on the ITS list when it has a delinquent debt with the FCIC or an approved insurance provider.[13]  Placement on the ITS is essentially a death sentence for a producer because without crop insurance, and in the event of a loss, the producer is left with no protection.

---

[9] *See* ECF #278-13, Ex. 11.
[10] *See* ECF #278-16, Ex. 14.
[11] *See* Risk Management Agency FAQ available at http://www.rma.usda.gov/help/faq/its.html.
[12] *Id.*
[13] *Id.*

The January 25 Letter did not mention the December 31 Letter.  However, on February 1,

2010, RCIS sent another letter that addressed the December 31 Letter,  but only to repeat its

demand for payment of the Overpaid Indemnity.  An unproductive email exchange ensued,

including a February 5, 2010 email (the "February 5 Email") in which RCIS advised First

Foliage that "RCIS considered [the December 31 Letter] to be an appeal" and advised that First

Foliage "should pursue mediation or arbitration as it deems appropriate."[14]  Nonetheless, on

February 8, 2010 (the "February 8 Letter") RCIS sent a letter to First Foliage, which stated that,

notwithstanding that RCIS would not withdraw its demand for  the Overpaid Indemnity

> without waiving any rights under the insurance policy or the procedures issued by
> the Risk Management Agency, RCIS will not, for the present, submit First
> Foliage's name and tax identification number for inclusion on ITS.  **If RCIS
> reconsiders its position, I will notify you accordingly,** and RCIS will provide
> First Foliage with the due process required by RMA procedures.[15]

(emphasis added).  The highlighted language forms the basis for the remaining dispute between

the parties.[16]

Between February, 2010 and June 2010, both RCIS and First Foliage pursued

administrative remedies, asking the RMA to issue findings based on First Foliage's omission. In

May 2010, First Foliage submitted five RMA Final Agency Determination ("FAD") requests to

the FCIC, seeking policy interpretations of  various sections of 7 C.F.R. §457.8, as it applies to

the 2001, 2005, 2006 and 2010 crop years, as reflected in forms 01-BR, 04-BR, and 05-BR and

its pertinent amendments.[17]  All of First Foliage's FAD requests were denied as untimely.[18]

---

[14] *See* ECF #278-16, Ex. 14.

[15] *See* ECF #278-17, Ex. 15.

[16] The Complaint also alleged liability based on the failure of RCIS or its agent to advise First Foliage that two names were missing from the SBI list.  However, I previously granted, in part, a motion to dismiss, holding that the Trustee could not blame RCIS or its agent for the carelessness of the principles of First Foliage in failing to read a form that was one third the size of a regular page.

[17] *See* ECF #278, p. 12 n. 23: First Foliage "sought policy interpretations declaring: (a) that—as it applies to the 2006 crop year—the insured may supplement its applications to include omitted SBI information; (b) that the

On June 1, 2010, RCIS informed First Foliage that RCIS had placed First Foliage on the ITS with an effective date of February 25, 2010.[19]  At no time between February 8 and June 1 did RCIS inform First Foliage that it would be placing First Foliage on the ITS.

Unable to continue business without insurance, First Foliage filed for chapter 11 on June 23, 2010.  On September 13, 2010, First Foliage filed this adversary proceeding.  On January 13, 2012, after First Foliage sold its assets in a bankruptcy auction,[20] the bankruptcy case was converted to chapter 7, and Jacqueline Calderin was appointed as the chapter 7 trustee (the "Trustee").[21]  On May 5, 2012, the Trustee, now the Plaintiff by virtue of the conversion, filed the Second Amended Complaint (ECF #140) (the "Complaint").  RCIS and Fireman's Fund moved to dismiss the Complaint, which Motion I granted in part. The remaining operative counts of the Complaint are a portion of Count II, Count III, a portion of Count IV, Count V, and Count VI.

Count II alleges breach of contract.  I previously dismissed that portion of Count II that alleged RCIS breached its contract with First Foliage by failing to get First Foliage to sign a separate required SBI Certification Statement.  The balance of Count II alleges RCIS breached its contract with First Foliage by reporting First Foliage to ITS without providing First Foliage due process, thereby improperly making the demand for the Overpayment Indemnity, and failing to allow First Foliage to supplement its 2000 and 2005 applications.  Count III asserts that RCIS

---

interpretation in "a"also applies to the 2001 and 2005 crop years; (c) that absent concealment, misrepresentation or fraud on the part of the insured, an insurer is not authorized to demand repayment of an indemnity where the omission of SBI information was of persons on the non-standard classification system list; (d) that—as it applies to the 2010 crop year—neither an insured nor an insurer may seek or obtain an interpretation from the FCIC for crop years preceding the 2007 crop year; and (e) that the insurer must initiate an arbitration proceeding within one (1) year of its payment of a loss in order to resolve any disagreement respecting the insurer's demand for repayment."

[18] *See* 7 C.F.R. §400.765(b): "Requesters may seek interpretations of those provisions of the Act and the regulations promulgated thereunder that are in effect for the crop year in which the request under this subpart is being made and the three previous crop years."

[19] *See* ECF #278-22, Ex. 20.

[20] The sale was conducted pursuant to 11 U.S.C. §363.

[21] *See* main case #10-27532, ECF #571.

was negligent because RCIS failed to provide notice to First Foliage prior to placing First Foliage on the ITS.  Count IV asserts that RCIS breached its fiduciary duty of due care by failing to notify First Foliage prior to placing First Foliage on the ITS.  Count V alleges that RCIS operated with unclean hands when it failed to provide First Foliage with prior notice and thus, because of the doctrine of unclean hands and equitable estoppel, RCIS was and should be estopped from recovery.  Count VI states that in the event that RCIS's claim against First Foliage is upheld, the Trustee is entitled to recovery of all overpaid premiums First Foliage paid to RCIS because those payments are avoidable transfers under 11 U.S.C. §544(b) and Fla. Stat. §726.105.

RCIS filed its Amended Answer and Affirmative defenses (ECF #235-1) (the "Answer"). RCIS's affirmative defenses are: (1) the Trustee's claims are barred by waiver; (2) to the extent any damages were suffered due to negligence, First Foliage caused its own damages; (3) unclean hands; (4) estoppel; (5) the Trustee has no basis or claim to recover any attorney's fees under statute or contract; (6) the Trustee's remedy sought is barred by contract and by federal non-bankruptcy law; (7) the negligence claim is barred by the economic loss rule; (8) First Foliage waived the right to claim that RCIS, Insurance for Agriculture, Fireman's Fund, and/or the RMA have altered the terms of the insurance policies through course of conduct, course of dealing, estoppel and/or otherwise; (9) RCIS is entitled to setoff; 10) RCIS is entitled to a right of recoupment.

## ANALYSIS

### The Second Amended Complaint

With respect to the Motion for Summary Judgment, there are certain overarching issues, the resolution of each, RCIS submits, is appropriate for summary judgment, and which would then necessitate summary judgment on all remaining counts in favor of RCIS.[22]  I will address these in the order presented by RCIS.

### Causation

According to RCIS, there is no dispute that First Foliage was already insolvent, and already headed for financial disaster, when RCIS placed First Foliage on the ITS—bankruptcy was the inevitable result of First Foliage's financial problems.  Consequently, whatever RCIS did or did not do could not possibly have caused the damages allegedly suffered by First Foliage.  RCIS argues that the Trustee is judicially estopped from claiming that First Foliage was insolvent, and *in extremis*, and therefore, there is no fact that I should or could consider to contradict the inevitability of the bankruptcy.  Further, RCIS points to the deposition testimony of First Foliage's bankers and principals, which testimony, RCIS asserts, clearly shows that bankruptcy was inevitable.  Thus, since the Trustee cannot show causation, summary judgment is appropriate on all remaining counts of the Complaint.

To assert judicial estoppel in an action "[f]irst, it must be shown that the allegedly inconsistent positions were made under oath in a prior proceeding.  Second, such inconsistencies must be shown to have been calculated to make a mockery of the judicial system." *Burnes v.*

---

[22] Although the Motion for Summary Judgment purports to seek summary judgment on Count VI of the Complaint, RCIS never addresses this Count in its pleadings.  Accordingly, I assume either the summary judgment on this Count was abandoned, or the relief sought was limited to the impact of the recoupment defense.

*Pemco Aeroplex, Inc.,* 291 F.3d 1282, 1285 (11th Cir. 2002) (quoting *Salomon Smith Barney,*

*Inc. v. Harvey, M.D.,* 260 F.3d 1302, 1308 (11th Cir. 2001)).

> Judicial estoppel is an equitable doctrine invoked at a court's discretion. *New Hampshire v. Maine,* 532 U.S. 742, 750, 121 S.Ct. 1808, 1815, 149 L.Ed.2d 968 (2001) (internal citations and quotations omitted). Under this doctrine, a party is precluded from "asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding. Judicial estoppel is an equitable concept intended to prevent the perversion of the judicial process." 18 James Wm. Moore et al., *Moore's Federal Practice* §134.30, p. 134–62 (3d ed. 2000). The purpose of the doctrine, "is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire,* 532 U.S. at 749–50, 121 S.Ct. at 1814 (internal citations and quotations omitted). This Circuit has explained that, "[j]udicial estoppel is applied to the calculated assertion of divergent sworn positions. The doctrine is designed to prevent parties from making a mockery of justice by inconsistent pleadings." *American Nat'l Bank of Jacksonville v. Federal Dep. Ins. Corp.,* 710 F.2d 1528, 1536 (11th Cir. 1983) (internal citation omitted); *see also,* [ *In re* ] *Coastal Plains* [ *Inc.*], 179 F.3d at [197] 205 [ (5th Cir. 1999) ] (explaining that, "[t]he purpose of the doctrine is to protect the integrity of the judicial process by preventing parties from playing fast and loose with the courts to suit the exigencies of self interest.") (internal quotations omitted).

*Burnes v. Pemco Aeroplex, Inc.,* 291 F.3d at 1285.[23]

The Trustee correctly argues that neither her position regarding insolvency in the

adversary proceedings, nor First Foliage's financial distress eight months into the case,[24] are

inconsistent with the Trustee's assertion that placement on the ITS forced First Foliage into

bankruptcy.  Moreover, the Trustee points out, the position that a company in financial distress

could avoid bankruptcy does not, by any means, make a mockery of the judicial system.

Because I agree with the Trustee that these positions are not inconsistent, I find that judicial

estoppel does not prevent the Trustee from asserting insolvency in this adversary proceeding.

---

[23] The Eleventh Circuit recognized that the United States Supreme Court had recently described various factors to consider when determining whether judicial estoppel has been appropriately invoked, and held that the Eleventh Circuit requirements were consistent with the Supreme Court's instructions. *Id.*

[24] The Trustee argues that she is not bound by the First Foliage's statements in any case, relying on *Parker v. Wendy's Int'l, Inc.*, 365 F.3d 1268, 1273 (11th Cir. 2004).  I do not need to reach that issue.

In addition, the Trustee, through affidavits and depositions, has adequately demonstrated that there are material disputed facts regarding the cause of First Foliage's bankruptcy and the consequent alleged damages.  The issue of proximate cause is generally a question of fact, reserved for the fact-finder and is concerned with "whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred." *McCain v. Fla. Power Corp.,* 593 So. 2d 500, 502 (Fla. 1992); *see also Fla. Power & Light Co. v. Periera*, 705 So. 2d 1359, 1361 (Fla. 1998).  To paraphrase the Florida Supreme Court—while the duty element of negligence opens the door to the courthouse, the causation element is a "specific *factual* requirement that must be proved to win the case once the courthouse doors are open." *McCain,* 593 So. 2d at 502.

Consequently, the issue of causation in this case is not an issue that can be determined on summary judgment.

**<u>Damages</u>**

RCIS argues that the regulations and the Crop Policies restrict the Trustee's right to seek damages.  Both the contracts and the applicable regulations limit the maximum amount that an insured can recover to the amount of liability established, or which should have been established, under the policy.[25]  Consequently, RCIS asserts, because it paid First Foliage the maximum amount to which First Foliage could have possibly been entitled under the Crop Policies (or, as this dispute underscores, overpaid First Foliage), the Trustee cannot recover any additional funds even if liability is proven.  Further, RCIS contends, the same language in the Crop Policies bars the Trustee's recovery of any

---

[25] Sec. 20(c) of the 2005 Policy provides that, "[n]o award determined by arbitration, appeal, administrative review or reconsideration process can exceed the amount of liability established or which should have been established under the policy."  Similarly, Sect. 20(h) of the 2006 Policy states that, "no award or settlement in mediation, arbitration, appeal, administrative review or reconsideration process or judicial review can exceed the amount of liability established or which should have been established under the policy."

consequential damages, even those arising from negligence. RCIS asserts that this limitation is enforceable because Florida courts uphold such exculpatory provisions when the parties' intention is unambiguous and the relative bargaining power of the parties is equivalent.

The Trustee, however, responds that the limitations language upon which RCIS relies applies solely to disputes arising from the claims adjustment process. Thus, for example, were the Trustee seeking damages relating to the actual claim dispute—whether and to what extent First Foliage received an overpayment and how much, if any, should be returned—then the limitations language relied upon by RCIS would apply.[26] However, the Trustee is not seeking damages relating to the claims adjustment process, but rather, the Trustee is seeking damages arising from RCIS's failure to notify First Foliage prior to placing First Foliage on the ITS.[27]

RCIS contends that whatever the basis for its liability, if any, the Trustee's damages should be limited to $924,233.33, notwithstanding the Trustee's expert's calculations that damages incurred total $2,944,667. The damages claimed by the Trustee include $2,020,413.80 of costs and other distributions associated with the bankruptcy case that were ultimately paid by a "carve out" from First Foliage's secured creditor, Bank of America. RCIS argues that the Trustee cannot seek damages that were "suffered" by Bank of America, in light of the waiver by Bank of America of any unsecured deficiency claim—in other words, these "costs" did not cost the estate or its

---

[26] The Trustee also disputes that the RCIS and First Foliage had equal bargaining power since the crop insurance regulations leave the growers with only the option to take the insurance or remain uninsured. However, it is not necessary for me to address either the validity or the import of such argument in ruling on the Motion for Summary Judgment.

[27] The Trustee also argues that, as the contract term has expired, the limitations language is no longer applicable. Although I do not believe that the Trustee's argument is well-founded, I do not need to address that argument in resolving this portion of the Motion for Summary Judgment.

unsecured creditors anything.  The Trustee counters that the funds distributed by Bank of America for professional fees came from the proceeds of the sale of First Foliage's business, and therefore, notwithstanding that all of the money was ultimately payable to Bank of America on account of its claim, the proceeds were property of the estate and, therefore, any diminution of those proceeds are recoverable by the Trustee.

While the Trustee's argument has superficial appeal, there appears to be no dispute that the unsecured creditors of the estate were not damaged by the expenses paid by Bank of America (indeed, those unsecured creditors were benefitted by Bank of America's set aside of $150,000 for them).  Florida courts have adopted the Black's Law Dictionary definition of damages—"money claimed by, or ordered to be paid to, a person as compensation for loss or injury." *See State Farm Mut. Auto. Ins. Co. v. Nichols,* 932 So. 2d 1067 (Fla. 2006); *Martin County v. Polivka Paving, Inc.,* 44 So. 3d 126 (Fla. 4th DCA 2010) (M. May dissenting).   There having been no *loss* or *injury* to the estate on account of payments made by Bank of America, those expenses cannot be included in the calculation of damages.   Nonetheless, the Trustee is seeking damages in excess of the funds paid by Bank of America.  Moreover, to the extent the Trustee ultimately prevails, she may be entitled to fees and costs associated with this adversary proceeding, relief that was not addressed in the summary judgment pleadings, but which is requested in the Second Amended Complaint.

Accordingly, RCIS is entitled to partial summary judgment with respect to the damages sought by the Trustee; the Trustee may not recover as damages those costs and expenses paid by Bank of America.

**Due Process**

RCIS advocates that it has no liability to First Foliage, and is, consequently, entitled to summary judgment on all counts of the Second Amended Complaint because RCIS provided First Foliage with all of the due process to which First Foliage was entitled to under the applicable regulations. The Trustee disagrees, arguing that the documents submitted in connection with the motions for summary judgment show that there are in fact genuine issues of material fact as to whether RCIS deprived First Foliage of its right to crop insurance without affording First Foliage the due process required by the Constitution, the FCIA and the regulations.

The Trustee has not articulated a legal argument that would support her assertion that the actions of RCIS trigger any right to constitutional Due Process.[28]  As RCIS notes in its reply, "[t]he due process clause of the fifth and fourteenth amendment applies only to governmental activities and not those of a non-governmental entity. . ..”  *Watts v. Union Pacific Railroad Co.,* 796 F.2d 1240, 1245 (10th Cir. 1986).  Thus, for purposes of this case, I find that the Trustee is not entitled to raise constitutional Due Process and its attendant criteria in support of her defense to summary judgment, or in support of her case at trial.

Nonetheless, there are disputed issues regarding whether RCIS provided First Foliage with the "due process" that the regulations require.[29]  There are two areas of concern raised by

---

[28] The Trustee was given additional opportunity after oral argument to submit further briefing on this issue, but failed to do so, other than to provide a short email citing to one inapplicable case.

[29] RCIS acknowledges that First Foliage was entitled to procedural due process, but argues, as noted, that it provided such to First Foliage.

the Trustee, both of which entitle the Trustee to put on a case.[30]  The first is with the December

31 Letter and the February 5 Email acknowledging that the December 31 Letter was the appeal,

but directing First Foliage to "mediate or arbitrate."  The second is the timing issue—the Trustee

argues that RCIS's delay in demanding the Overpaid Indemnity deprived First Foliage of any

process to which it was entitled under the applicable regulations.

As the Trustee outlines in her response, the February 5 Email was the only "ruling" that

First Foliage received in response to its December 31 "Notice of Appeal."  RCIS did not hold

any hearings or articulate any particular review process, procedure or standards.  RCIS did not

provide any information whatsoever from which First Foliage could derive any understanding of

what RCIS considered in making its determination; RCIS merely acknowledged the appeal, and

directed First Foliage to move on to the next step—mediation or arbitration.

7 C.F.R. §400.680(a) requires that,

> The insurance provider must send a written notice of the debt to the person,
> including the time frame in which the debt must be paid, and provide the
> person with a meaningful opportunity to contest the amount or existence of the
> debt.

In order for this regulation—which undisputedly governs RCIS's appellate process—to have

any meaning whatsoever, compliance by RCIS with the "meaningful opportunity" requirement

must mean something more than a summary, undifferentiated denial.[31]  Procedural due process

requires a minimal level of procedure.  Moreover, the February 8 Letter stated that if RCIS did

decide to place First Foliage on the ITS, First Foliage would be notified "and RCIS will provide

First Foliage with the due process required by RMA procedures."  Thus, I will need to determine

---

[30] The Trustee also argues that RCIS reporting First Foliage for the ITS was inconsistent with the representations
made in the February 8 Letter and provides additional support for her due process argument.  The February 8 Letter,
and the alleged breach of the promise to notify First Foliage, do not constitute a violation of due process.  The
claims the Trustee may assert under other theories of recovery are addressed elsewhere in this opinion.
[31] *See generally* deposition of Tanya Rowe.

whether the process RCIS employed prior to, or subsequent to, the February 8 Letter (assuming there was any process) met those requirements.

The Trustee also argues that the delay by RCIS in advising First Foliage of the Overpaid Indemnity deprived First Foliage of any recourse to arbitration or mediation. 7 C.F.R. §457.8 (20)(a)(1) states that "all disputes involving determinations made by us, except those specified in section 20(d) or (e), are subject to mediation or arbitration. However, if the dispute in any way involves a policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy provision to the procedure, either you or we must obtain interpretation from FCIC in accordance with 7 C.F.R. part 400, subpart X or such other procedures as established by FCIC." 7 C.F.R. §400.765(b) states: "Requesters may seek interpretations of those provisions of the Act and the regulations promulgated thereunder that are in effect for the crop year in which the request under this subpart is being made and the three previous crop years." RCIS[32] first advised First Foliage of the Overpayment Demand on December 3, 2009, which is more than three years after either the 2005 Payment or the 2006 Payment. Whether this delay effectively deprived RCIS of procedural due process is not something that I can resolve on summary judgment.[33]

**Fiduciary Duty**

Count IV of the Complaint alleges that RCIS owed First Foliage a "fiduciary duty of due care" which duty was breached when RCIS placed First Foliage on the ITS without the prior

---

[32] RCIS has argued that it was not informed by RMA until October, 2009 about the First Foliage SBI (and other) problems, but that is an issue between RCIS and RMA—not a dispute before me.

[33] RCIS raises as a defense First Foliage's failure to seek arbitration or mediation from RMA until May, long after the February 8 Letter. However, RCIS has not adequately explained how this delay is meaningful, given that the basis for the denial of review was the expiration of time long before the February 8 Letter or even the December 31 Letter.

notice and due process promised in the February 8 Letter.[34]   RCIS argues there is no fiduciary

duty between insureds and insurers except under limited circumstances not applicable here.

The Trustee argues that, while  insurers generally do not owe insureds any fiduciary

obligations, the allegations of the Complaint are based on fiduciary obligations stemming from

the unique and specific set of circumstances that arose when RCIS declared it would give First

Foliage notice before placing First Foliage on the ITS.

The Florida Supreme Court has consistently recognized that a fiduciary relationship can

arise in a variety of circumstances.

> The relation and duties involved need not be legal; they may be moral, social, domestic or personal. *If a relation of trust and confidence exists between the parties (that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief.*   The origin of the confidence is immaterial.

*Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002) (quoting *Quinn v. Phipps*, 113 So. 410, 421 (Fla.

1927), emphasis in the original).   An express fiduciary relationship is created by contract or

pursuant to specific legal process. An implied fiduciary relationship is "based on the specific

factual circumstances surrounding the transaction and the relationship of the parties."  *First Nat'l*

*Bank & Trust Co. of Treasure Coast v. Pack*, 789 So. 2d 411, 414 (Fla. 4th DCA 2001).

Citing to *Doe v. Evans* and *Quinn v. Phipps* the Third District Court of Appeal

summarized Florida law:

> Fiduciary relationships may be implied in law and such relationships are premised upon the specific factual situation surrounding the transaction and the relationship of the parties." [*Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 842 So. 2d 204, 207 (Fla. 3d DCA 2003)].   Courts have found a fiduciary relation implied in law when "confidence is reposed by one party and a trust accepted by the other." *Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 518 (Fla. 3d DCA 1994).  To establish a fiduciary relationship, a party must allege some

---

[34] The balance of this Count was the subject of the order partially granting the motion to dismiss, which is discussed *supra*.

> degree of dependency on one side and some degree of undertaking on the other
> side to advise, counsel and protect the weaker party. *Watkins v. NCNB Nat'l
> Bank of Fla., N.A.*, 622 So .2d 1063, 1065 (Fla. 3d DCA 1993).

*Brigham v. Brigham*, 11 So. 3d 374, 387 (Fla. 3d DCA 2009).

Outside the purview of Fla. Stat. §624.155,[35] which RCIS argues, and the Trustee

concedes, is not applicable to this dispute, the relationship between an insured and insurer is one

of contract, an obligation between a debtor and a creditor. *See Allstate Indem. Co. v. Ruiz*, 899

So. 2d 1121 (Fla. 2005); *Time Ins. Co. v. Burger*, 712 So. 2d 389 (Fla. 1998). Thus, there is

nothing in the relationship between an insured and insurer generally that creates a heightened

duty. Nonetheless, First Foliage argues that it was the weaker of two contracting parties, and by

virtue of reposing its confidence in RCIS, allegedly the sole source for crop insurance available

to First Foliage,[36] that imbalance of power created a fiduciary relationship. I do not accept this

argument. This dispute involves two sophisticated parties, each represented by attorneys fully

versed in the relative rights and obligations of the parties under the applicable contracts and

regulations. While the February 8 Letter may have given rise to certain rights and obligations

between the parties, it did not create a fiduciary relationship where none had existed before.

As there is no disputed material fact relating to this issue, the Motion for Summary

Judgment as to Count IV of the Complaint is granted.

---

[35] Fla. Stat. §624.155 outlines civil remedies available to a person against an insurer for violation of certain sections of the Florida Insurance Code, and for failing to act appropriately in the settlement of insurance claims.
[36] RCIS disputes this, but it is not relevant to my decision.

## Negligence

RCIS seeks summary judgment on Count III of the Second Amended Complaint—Negligence.  To resolve this issue I must look at Florida law; because the alleged tort occurred in Florida, Florida law applies to the negligence claim.[37]

A cause of action for negligence requires the plaintiff to prove four elements:  (1) the defendant owed a duty of reasonable care to the plaintiff; (2) the defendant breached that duty; (3) the breach was the proximate cause of the injury to the plaintiff; and (4) the plaintiff suffered damages.  *Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216, 1227 (Fla. 2010); *Clay Elec. Coop., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003).  Failure to establish any one of the elements is fatal to the plaintiff's case.  *See Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984).

The Trustee alleges that the February 8 Letter created a duty in RCIS to notify First Foliage prior to putting First Foliage on the ITS, that the failure to notify First Foliage was a breach of that duty, which breach caused First Foliage to file bankruptcy, which bankruptcy ultimately damaged First Foliage.[38]

## Duty

Duty arises when the law recognizes an obligation

> requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks." *Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003) (citation omitted). With regard to this element, whether a duty exists is a question of law for the court. *Goldberg v. Fla. Power & Light Co.*, 899 So.2d 1105, 1110 (Fla. 2005). Crucial to the duty inquiry is "whether the defendant's conduct foreseeably create[s] a broader 'zone of risk' that poses a general threat of harm to others." *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992). "[T]he zone of risk created

---

[37] Absent a significant relationship to another state, "the state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law." *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980).

[38] I have already addressed the causation and damages arguments of the parties.

> by a defendant defines the scope of the defendant's legal duty and the scope of
> the zone of risk is in turn determined by the foreseeability of a risk of harm to
> others." *Smith v. Fla. Power & Light Co.*, 857 So. 2d 224, 229 (Fla. 2d DCA
> 2003).

*Knight v. Merhige*, 133 So. 3d 1140, 1144-45  (Fla. 4th DCA 2014).

Thus, the principle of "duty" is linked to the concept of foreseeability and may arise from four general sources: (1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case.  *McCain v. Fla. Power Corp.,* 593 So. 2d at 503 n. 2. *See Clay Elec. Coop., Inc.*, 873 So. 2d at 1185; Restatement (Second) of Torts §285 (1965).

The present case falls within the fourth category, i.e., the alleged duty arises from the general facts of the case.

> Whenever one undertakes to provide a service to others, whether one does so
> gratuitously or by contract, the individual who undertakes to provide the
> service-i.e., the "undertaker"-thereby assumes a duty to act carefully and to not
> put others at an undue risk of harm. This maxim, termed the "undertaker's
> doctrine," applies to both governmental and nongovernmental entities.

*Clay Elec. Co-op, Inc. v. Johnson*, 873 So. 2d at 1185-86.

RCIS argues that the February 8th Letter did not create any duty of care, but rather, the February 8 Letter was merely a response to First Foliage's expression to RCIS that the company had decided to file an arbitration to dispute the alleged overpayments.[39]  However, this argument is not supported by the letter.  Notwithstanding any contractual or administrative right or remedy that might otherwise apply, in the February 8 Letter RCIS undertook the duty to notify First Foliage prior to reporting First Foliage to the ITS.  Moreover, as the consequences of the report to the ITS are so severe, it was foreseeable that First Foliage would rely on that representation made by RCIS in the February 8 Letter.  Thus, I find that, as a matter of law, the February 8

---

[39] *See* ECF #278, p. 31.

Letter gave rise to a duty by RCIS to First Foliage to advise First Foliage prior to reporting First Foliage to the ITS.

There is no dispute that RCIS reported First Foliage to the ITS without the promised notice; when it did so RCIS breached its duty to First Foliage.  Therefore, it is appropriate for this Court to deny summary judgment to RCIS and to grant summary judgment in favor of the Trustee with regard to the first two elements of Count III of the Complaint.[40]

**Equitable Estoppel**

RCIS seeks dismissal of Count V of the Complaint, because, under Florida law, equitable estoppel and unclean hands are not recognized as causes of action, but rather, defenses to claims—that is, as RCIS puts it, equitable estoppel and unclean hands can only be used as a shield, not a sword.  The Trustee did not refute this argument in her response; presumably for good reason—RCIS is correct.[41]  Accordingly the motion is granted with respect to Count V and summary judgment in favor of RCIS is granted with respect to that Count.[42]

## The Affirmative Defenses

The Trustee seeks summary judgment in her favor with respect to all the affirmative defenses raised by RCIS.[43]  RCIS seeks summary judgment only with respect to its defense of recoupment—a defense to which RCIS argues it is entitled as a matter of law.

---

[40] When considering a motion for summary judgment, the court may *sua sponte* enter summary judgment in favor of the non-moving party.  *See Fabric v. Provident Life & Acc. Ins. Co.*, 115 F.3d 908, 914-15 (11th Cir. 1997).

[41] *See Major League Baseball v. Morsani*, 790 So. 2d 1071, 1077 (Fla. 2001) ("The doctrine bars the wrongdoer from asserting that shortcoming and profiting from his or her own misconduct. Equitable estoppel thus functions as a shield, not a sword, and operates against the wrongdoer, not the victim").

[42] I will address below the Trustee's Motion for Summary Judgment with respect to RCIS's affirmative defenses of equitable estoppel and unclean hands.

[43] RCIS acknowledges that its economic loss rule defense is no longer viable due to the ruling by the Florida Supreme Court in *Tiara Condominium Ass'n, Inc. v. Marsh & McLennan Companies*, 110 So. 2d 399 (Fla. 2013).

## Recoupment

RCIS asserts that it is entitled as a matter of law to assert its affirmative defense of recoupment.  The Trustee counters that RCIS may not assert recoupment because RCIS cannot satisfy the "same transaction" test.  RCIS argues that the Trustee's claims against RCIS arise from the Crop Policies, and First Foliage's refusal to repay the Overpaid Indemnity and the act of placing First Foliage on the ITS, each arose from the same contracts and First Foliage's refusal to pay.  The Trustee argues that her claim against RCIS arises from the circumstances surrounding its decision to place First Foliage on the ITS without giving First Foliage prior notice.  Each side cites to several cases (some the same) in support of their respective positions.

The parties are in agreement that, in order to sustain a defense or claim for recoupment the creditor must prove that: (1) the mutual debts arose from the same transaction; (2) the creditor is asserting recoupment as a defense; and (3) the "main action" is timely. *Smith v. American Financial Systems, Inc. (In re Smith)*, 737 F.2d 1549, 1553 (11th Cir. 1984).

Recoupment is an equitable remedy of limited application.

> [Recoupment] should be limited in bankruptcy cases to situations in which both debts arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations. "In light of **recoupment's** equitable foundation, the doctrine is only applicable to claims that are so closely intertwined that allowing the debtor to escape its obligation would be inequitable notwithstanding the Bankruptcy Code's tenet that all unsecured creditors share equally in the debtor's estate.

*Affiliated of Fla., Inc. v. Mount Olive Pickle Co. (In re Affiliated of Fla., Inc.)*, 258 B.R. 495, 499 (Bankr. M.D. Fla. 2000) (internal citations omitted).  The Eleventh Circuit has defined recoupment as "the right of a defendant, in the same action, to cut down the plaintiff's demand either because the plaintiff has not complied with some cross obligation of the contract on which he sues or because he has violated some duty which the law imposes on him in the making or

performance of that contract." *In re Smith*, 737 F. 2d at 1552, n. 7 (quoting Ballentine's Law Dictionary 1070 (3d ed. 1969). As the Second Circuit noted in *In re Malinowski*, 156 F.3d 131, 133 (2d Cir. 1998), the automatic stay does not apply in respect of recoupment "because funds subject to recoupment are not the debtor's property." In other words, the claims of the debtor and creditor are so intertwined, so integrated in one transaction, that equity essentially recognizes that the obligations are merged—as if they cease to exist independently of one another.

In this case, while there is no question that the claims between First Foliage and RCIS all stem from the same relationship and ultimate dispute—RCIS as crop insurance provider and First Foliage as the insured who failed to properly disclose required information—the claims do not arise from the same transaction and are not so intertwined or interrelated that one should be viewed as merging with the other. RCIS's claims against First Foliage arise from First Foliage's failure to properly complete its crop insurance applications and the consequent obligation to return the Overpaid Indemnity. Conversely, the claims of the Trustee against RCIS arise from the February 8 Letter, and actions RCIS took or failed to take subsequent to that letter—a letter that RCIS was not obligated to send under the applicable contracts or regulations. Thus, RCIS is not entitled to assert recoupment as an affirmative defense, and partial summary judgment is granted in favor of the Trustee.

## **Setoff**

In its affirmative defense of setoff, RCIS asserts that it is entitled to a right to setoff any amount claimed by the Trustee in the Second Amended Complaint against all monies owed to RCIS by First Foliage, including the Overpayment Indemnity.

In the Motion for Partial Summary Judgment, the Trustee asserts that RCIS cannot setoff any damages the Trustee may recover because the Trustee's claim against RCIS is contingent

and unmature, because RCIS has failed to establish mutuality as required by 11 U.S.C. §553, and

because RCIS's claim for the 2005 Overpayment Demand has been disallowed.[44]

The right to setoff is set out in section 553(a)(1):

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—
> (1) the claim of such creditor against the debtor is disallowed; …

To establish a valid right to setoff under section 553, the following elements must be shown:

"(1) debt owed by creditor to debtor that arose prepetition; (2) claim of creditor against debtor

that arose prepetition; (3) debt and claim are mutual obligations; and (4) right to set off debts

under nonbankruptcy law." *In re Holder*, 182 B.R. 770 (M.D. Tenn. 1995). "Setoff [under

section 553] is an established creditor's right to cancel out mutual debts against one another in

full or in part … 'to avoid the absurdity of making A pay B when B owes A.'" *In re Prudential

of Florida Leasing, Inc.*, 478 F.3d 1291, 1297 (11th Cir. 2007) (quoting *In re Patterson*, 967 F.2d

505, 508-09 (11th Cir. 1992)).

Moreover, "'[t]he right of setoff under section 553 is permissive, not mandatory ...' and

its allowance is within the discretion of the court." *In re Express Freight Lines, Inc.*, 130 B.R.

288, 290 (Bankr. E.D. Wis. 1991) (citations omitted). Accordingly,

> Courts look to the parties' contractual relationship in the light of state law to determine whether there is a valid and enforceable basis for setoff before considering whether it would be equitable to allow it.... Although there must be a state law right of setoff in order for 11 U.S.C. § 553 to be applicable, the granting or denial of setoff after one of the parties files a bankruptcy petition is prescribed by the terms of 11 U.S.C. § 553.... In other words, 11 U.S.C. § 553 limits the use of setoff rights already available under state law, but it does not expand setoff rights to encompass rights that do not otherwise exist under state law.

---

[44] *See* transcript dated August 29, 2012, Case No. 10-27532; ECF #796.

*Id.  Accord, In re Prudential of Florida Leasing, Inc.*, 478 F.3d at 1297.  Additionally, section 553(a)(1) only authorizes setoff of a claim, thus, setoff is not permissible to the extent the claim is disallowed.  *See In re Mayan Networks Corp.*, 306 B.R. 295, 302 (B.A.P. 9th Cir. 2004).

Both parties agree that "under Florida law … contingent or unmatured claims may not be used to effect a setoff."  *In re Tower Envtl. Inc.*, 217 B.R. 933, 937 (citing *In re Aquasport*, 155 B.R. 720 (Bankr. S.D. Fla. 1990)).[45]  However, the parties disagree how this condition should be applied in this case.  The Trustee argues, incorrectly, that the contingent nature of her claim against RCIS bars RCIS's right to claim setoff.  However, as RCIS points out in its response – RCIS would only be barred from asserting its setoff defense if <u>its</u> claim was unliquidated or contingent—it is neither.

Nonetheless, the Trustee is correct that section 553 bars RCIS from using its claim for the 2005 Overpayment Demand as a setoff against any amount the Trustee may recover from RCIS.  As already noted, I previously have ruled this claim is barred by the statute of limitations.

Accordingly, the Trustee is entitled to partial summary judgment on the setoff affirmative defense.  RICS will only be entitled to assert setoff with respect to the 2006 Overpayment Demand.

## Equitable Estoppel

A claim of equitable estoppel "requires (1) a representation of fact by one party contrary to a later asserted position; (2) good faith reliance by another party upon the representation; and (3) a detrimental change in position by the later party due to the reliance."  *MSC Mediterranean Shipping Co. SA, Geneva v. Metal Worldwide, Inc.*, 884 F. Supp. 2d 1269, 1274 (S.D. Fla. 2012) (citing *Transp. Servs. Sea–Barge Grp., Inc. v. Python High Perform. Marine Corp.*, 16 F.3d

---

[45] Interestingly, *Aquasport* does not cite to any Florida cases in support of this limitation, nor could I find any case. Nonetheless, the limitation is logical and neither party contests its applicability.

1133, 1138–39 (11th Cir. 1994)); *see also Curci Village Condominium Assoc., Inc., v. Maria*, 14 So. 3d 1175, 1177-78 (Fla. 4th DCA 2009).

The Trustee argues that RCIS is not entitled to assert estoppel as a defense because, as a matter of law, RCIS cannot demonstrate either reliance or a change in position based on First Foliage's failure to disclose all of the SBI information.  It is the Trustee's position that RCIS cannot establish reasonable reliance as RCIS had the duty and the means  to verify the SBI information, and failed to obtain First Foliage's signature on the SBI certification statement. Further, the Trustee states that RCIS cannot establish detrimental change in position because the undisclosed SBI owners were eligible for crop insurance and RCIS would have had to pay the same amounts for the hurricane losses notwithstanding the omission.[46]

While the Trustee is correct that I have previously ruled that the Trustee cannot rely on the separate SBI verification requirement as a basis for much of her affirmative relief against RCIS, it does not mean that the Trustee is precluded from relying on this argument for any relief. As noted by the Trustee in her Motion for Partial Summary Judgment, a party seeking to rely upon the defense must show that the reliance "must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Heckler v. Community Health  Servs. of Crawford County,* 467 U.S. 51, 59 (1984). The Supreme Court continues—if the party claiming injury "had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying upon the representation or concealment." *Id.* at 59 n.10.  RCIS acknowledges that it cannot "turn a blind eye" towards any obvious misrepresentation, but that "it did not have the *reasonable* means

---

[46] *See* RMA Report at ECF #262, Ex. B, p. 4.

to acquire the knowledge about First Foliage's multiple inaccurate SBI disclosures."[47]   The record presented by the parties in support of their various motions and responses do not resolve this issue.   In order to determine whether, in fact, RCIS could claim to reasonably rely on the SBI omission, I will need evidence explaining the requirements and process that RCIS was expected to undertake by the RMA, that is, what was the purpose of the RMA procedure; why was reliance on the insured not considered "enough."

The debate between the parties about the detrimental change in position is superficially simple.   The Trustee argues that there was no change in position because RCIS would have paid the same loss had the SBIs been accurately disclosed because the undisclosed SBIs were eligible. RCIS counters that had the SBIs been fully and accurately disclosed, RCIS would not have had to repay the Overpaid Indemnity to the RMA.   Both parties are focusing on the wrong event. The change in position was RCIS's payment to First Foliage, which payment RCIS would not have made had it known about the misrepresentation.   Consequently, the resolution of this issue is tied directly to the reliance question I have already addressed above.   Therefore, the Trustee is not entitled to summary judgment on the affirmative defense of estoppel.

**<u>Unclean Hands</u>**

Unclean hand is an equitable defense based on the notion that "he who comes into equity must come with clean hands" and that unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith related to the matter in which he seeks relief, however improper may have been the behavior of the defendant."   *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814 (1945).   Both the Trustee and RCIS acknowledge that the unclean hands doctrine applies only as a defense to claims for equitable relief.   I have granted summary judgment to RCIS on the only count of the Complaint in which

---

[47] *See* RCIS's Response to Trustee's Motion for Summary Judgment, at ECF # 293, p. 14.

equitable relief was requested; RCIS is not entitled to assert unclean hands as an affirmative defense to any of the remaining counts of the Complaint and therefore, summary judgment is granted in favor of the Trustee with respect to the Trustee's unclean hands affirmative defense.

## CONCLUSION

Many claims and defenses have been asserted arising from what appears at first blush to be a relatively simple set of facts.  However, none are so simple that trial of this dispute can be avoided.  Accordingly trial will proceed on the remaining portions of Count II and Count III of the Complaint with respect to causation and damages and on Count VI.  RCIS's affirmative defenses of setoff will be limited to the 2006 Overpayment Demand; RCIS may not raise recoupment, estoppel, unclean hands or the economic loss rule as affirmative defenses.

The parties are directed to submit a scheduling order setting forth all remaining deadlines, the final pretrial date and trial dates after consultation with my courtroom deputy.[48]

# # #

Copies furnished to:
Michael D. Ehrenstein, Esq.
Jeffrey T. Kucera, Esq.

*Attorney Kucera shall serve a copy of this Order upon all parties in interest and file a certificate of service with the Clerk of the Court.*

---

[48] The Trustee has filed a motion seeking withdrawal of the reference of this adversary proceeding (ECF #277), to which the Defendants have objected (ECF #242).  The District Court has not ruled on the motion.  Accordingly, if the reference is withdrawn, scheduling of trial will be addressed by the District Court.